MERRILL LYNCH INVESTMENT
MANAGERS, Plaintiff–
Appellee,

v.

OPTIBASE, LTD., Defendant–
Appellant.

Docket No. 02–9195.

United States Court of Appeals,
Second Circuit.

Argued: April 14, 2003.

Decided: July 18, 2003.

Stephen P. Younger (Monica Youn, Deborah Steinberger, of counsel), Patterson, Belknap, Webb & Tyler LLP, New York, NY, for Defendant–Appellant.

Judith Welcom (Daniel A. McLaughlin, of counsel), Sidley Austin Brown & Wood LLP, New York, NY, for Plaintiff–Appellee.

Before: KEARSE, JACOBS, and CABRANES, Circuit Judges.

PER CURIAM.

Defendant–Appellant Optibase, Ltd. ("Optibase") suffered losses on an investment fund recommended by broker-dealer Merrill Lynch, Pierce, Fenner & Smith, Inc. ("MLPF&S"), with which Optibase had an agreement to arbitrate. Optibase commenced an arbitration asserting claims against three parties, including Plaintiff–Appellee Merrill Lynch Investment Managers ("MLIM")—a sister company to MLPF&S—which served as investment adviser for the fund, and with which Optibase had no agreement to arbitrate. MLIM sought in the district court a preliminary injunction restraining Optibase from proceeding with arbitration against MLIM in the New York Stock Exchange ("NYSE"). Optibase appeals from the grant of the preliminary injunction entered September 10, 2002 by the United States District Court for the Southern District of New York (Swain, *J.*).

Optibase contends that MLIM is bound to arbitrate with it on the grounds that (1) the arbitration agreement between Optibase and MLPF & S references affiliates of MLPF & S, of which MLIM is one, (2) MLPF & S was acting as agent of MLIM, and (3) in any event the injunction is barred by laches. We affirm.

## BACKGROUND

### A. Factual Background

The facts relevant to this appeal are undisputed.

Optibase, an Israeli corporation with offices in California and Massachusetts, offers broadband digital video streaming solutions. In 1999, Optibase's chief executive and chief financial officers met with a MLPF&S broker in New York City to discuss potential investment opportunities. MLPF&S is registered with the Securities and Exchange Commission ("SEC") as a broker-dealer, and is a member of the NYSE. MLPF&S is a wholly owned subsidiary of Merrill Lynch & Co., Inc. ("ML&Co."), a publicly held corporation. The MLPF&S broker advised Optibase to invest $4 million in the Merrill Lynch Senior Floating Rate Portfolio (the "Merrill Lynch Fund" or "Fund"), and Optibase did.

The investment adviser for the Fund is MLIM, a limited partnership. MLIM is neither a registered broker-dealer nor a member of the NYSE. It is one of the world's largest asset management organizations and manages approximately $500 billion in funds, including registered and unregistered investment companies, hedge funds, pension funds, 401(k) plans, unit investment trusts, personal trusts, and individual client accounts. The general partner of MLIM is Princeton Services, Inc., a wholly owned subsidiary of ML&Co. ML&C. is also MLIM's limited partner. Under the federal securities laws, ML&Co. and MLPF&S are deemed to be affiliates of MLIM.

In early August 2000, Optibase signed a Working Capital Management Account Agreement (the "Agreement") in connection with its account at MLPF&S. The arbitration clause that is a subject of this appeal provides in part:

The Customer agrees that all controversies that may arise between the Customer and MLPF&S ... shall be determined by arbitration.

J.A. at 362. Following the signature line, the Agreement adds:

MLPF&S and its affiliates shall be entitled to fully rely upon the above certifications, representations and warranties.

*Id.* at 127 (the "affiliate provision"). The next paragraph states:

In accordance with [the arbitration clause] of the WCMA Agreement, [Optibase] is agreeing in advance to arbitrate any controversies which may arise with MLPF&S.

*Id.*

On February 5, 2002, Optibase filed arbitration claims with the NYSE against MLIM and ML&Co. On March 11, 2002, Optibase filed an Amended Statement of Claim, adding MLPF&S as a party. The Amended Statement of Claim alleges, *inter alia,* that the Merrill Lynch Fund was an unsuitable investment; that the MLPF&S broker made several unauthorized purchases of the Fund for Optibase's account; that the total invested was approximately $14.8 million; that individuals managing the Merrill Lynch Fund for MLIM resigned at the end of October 2000 because the Fund was performing poorly; and that by reason of the conduct of MLIM, MLPF&S, and ML&Co., Optibase lost more than $2 million.

MLIM protested its inclusion in the arbitration, first to Optibase and then to the NYSE, on the ground that there was no basis for compelling it to arbitrate. By letter dated May 21, 2002, the NYSE denied MLIM's request that the NYSE decline the use of its facilities for the arbitration of Optibase's claims against MLIM, and instructed MLIM to answer the Amended Statement of Claim within 20 days, "[i]n the absence of a court ordered stay." J.A. at 29. On June 7, 2002, MLIM commenced this action, seeking *inter alia* to enjoin Optibase from pursuing its claims against MLIM in the NYSE arbitration. (ML&Co. and MLPF&S are not parties to this action.)

## B. District Court Proceedings

At a July 24, 2002 hearing in the district court, Optibase contended that MLIM was amenable to arbitration on the basis of the arbitration clause contained in the Agreement between MLPF&S and Optibase, or because MLPF&S acted as MLIM's agent. The court disagreed and orally granted MLIM's motion for a preliminary injunction, which was later memorialized and finally entered on September 10, 2002.

The court first concluded that the terms of the Agreement—in particular, the arbitration clause and the affiliate provision—did not bind MLIM: "[A] provision permitting an affiliate of MLPF&S to rely on certifications and representations by MLPF&S's counterparty to the Agreement does not constitute a commitment of affiliates of MLPF&S to arbitrate pursuant to that Agreement." Supplemental App. at 109–10. Next, the court rejected Optibase's agency argument: "[N]otwithstanding Optibase's representations that Merrill Lynch and its affiliates marketed themselves as coordinated entities, Optibase has proffered no evidence tending to show that MLPF & S was acting on behalf of MLIM when it entered into the ... [A]greement with Optibase." *Id.* at 111. Also, the court rejected Optibase's laches argument. *Id.* at 108–09.

## DISCUSSION

### A. Standard of Review

 We review a district court's grant of a preliminary injunction for abuse

of discretion. *Bronx Household of Faith v. Bd. of Educ.*, 331 F.3d 342, 348 (2d Cir.2003). "A district court 'abuses' or 'exceeds' the discretion accorded to it when (1) its decision rests on an error of law ... or a clearly erroneous factual finding, or (2) its decision—though not necessarily the product of a legal error or a clearly erroneous factual finding—cannot be located within the range of permissible decisions." *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 169 (2d Cir.2001) (footnote omitted).

■ As the party seeking a preliminary injunction, MLIM's burden before the district court was to establish: "(1) that it will be irreparably harmed if an injunction is not granted, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of the hardships tipping decidedly in its favor." *Bronx Household of Faith*, 331 F.3d at 348–49.

## B. Irreparable Harm

■ In finding that MLIM would suffer irreparable harm absent a preliminary injunction, the district court properly relied on *Maryland Casualty Co. v. Realty Advisory Board on Labor Relations*, 107 F.3d 979 (2d Cir.1997), which affirmed a preliminary injunction granted in favor of a party resisting arbitration on the ground that the dispute was outside the arbitration agreement. We observed that otherwise the movant "would be irreparably harmed by being forced to expend time and resources arbitrating an issue that is not arbitrable, and for which any award would not be enforceable." *Id.* at 985.

## C. Likelihood of Success on the Merits

Optibase contends that its dispute against MLIM is arbitrable because (1) MLIM is bound by the arbitration clause contained in the Agreement between Optibase and MLPF&S, and (2) an agency relationship between MLIM and MLPF&S exists that permits MLIM, as a non-signatory, to be bound by MLPF&S's agreement to arbitrate with Optibase.

■ It cannot be argued that MLIM is bound by the express terms of the arbitration clause contained in the Agreement between Optibase and MLPF&S:

> The Customer agrees that all controversies that may arise *between the Customer and MLPF&S*, including, but not limited to, those involving any transaction or the construction, performance or breach of this or any other agreement between the customer and MLPF&S, whether entered into prior to, on or subsequent to the date hereof, shall be determined by arbitration.

J.A. at 362 (emphasis added). Optibase relies on the combined force of this clause coupled with the affiliate provision ("MLPF&S and its affiliates shall be entitled to fully rely upon the above certifications, representations and warranties." *Id.* at 127). The district court was unpersuaded: "[A] provision permitting an affiliate of MLPF&S to rely on certifications and representations by MLPF&S's counterparty to the Agreement does not constitute a commitment of affiliates of MLPF&S to arbitrate pursuant to that Agreement." Supplemental App. at 109–10. We agree.

■ Absent an express agreement to arbitrate, this Court has recognized only "limited theories upon which [it] is willing to enforce an arbitration agreement against a nonsignatory." *Thomson–CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 780 (2d Cir.1995). There are five such theories: "1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel." *Id.* at 776.

 On this appeal, Optibase relies principally on an agency theory.[1] "Traditional principles of agency law may bind a nonsignatory to an arbitration agreement." *Id.* at 777. "Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." Restatement (Second) of Agency § 1 (1958). Agency between MLIM and MLPF&S is premised on their affiliate relationship and on the more various corporate relationships among MLIM, MLPF&S, and ML&Co., chiefly: that MLIM and MLPF&S are "owned and controlled" by ML&Co.; that two ML&Co. officers also serve as officers of MLIM; that MLPF&S brokers offer their clients products offered by Merrill Lynch entities advised by MLIM, such as the Fund, for which MLPF&S receives a fee; that MLPF&S markets the services of the entire Merrill Lynch family of companies to clients; and that the Merrill Lynch companies present to the public the image of a single, integrated firm.

In *Thomson–CSF,* similar considerations—mutual benefits derived from affiliation—were rejected as insufficient to bind a non-signatory on agency principles to an arbitration agreement signed by an affiliate. The district court had compelled Thomson–CSF to arbitrate with Evans & Sutherland Computer Corporation ("E&S") on the basis of an arbitration agreement between E&S and Rediffusion Simulation Limited ("Rediffusion"), a Thomson–CSF subsidiary. The district court applied a "hybrid" approach to compel arbitration by Thomson–CSF, a non-signatory to the arbitration agreement, relying on the following factors:

1) Thomson's common ownership of Rediffusion; 2) Thomson's actual control of Rediffusion; 3) Thomson's notice of the Working Agreement prior to purchasing Rediffusion; 4) E&S's express intention to bind Thomson to the Working Agreement; 5) Thomson's incorporation of Rediffusion into its own organizational and decision-making structure; and 6) Thomson's benefit from that incorporation.

*Thomson–CSF,* 64 F.3d at 780. This Court rejected that approach:

The district court below improperly extended the limited theories upon which this Court is willing to enforce an arbitration agreement against a nonsignatory. The district court's hybrid approach dilutes the safeguards afforded to a nonsignatory by the ordinary principles of contract and agency and fails to adequately protect parent companies, the subsidiaries of which have entered into arbitration agreements. Anything short of requiring a *full* showing of some accepted theory under agency or contract law imperils a vast number of parent corporations. This Court did not intend such an outcome in [prior opinions] and does not adopt such an approach here.

*Id.* (internal quotation marks omitted).

Optibase relies on a Third Circuit case, *Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 7 F.3d 1110 (3d Cir.1993), which involved a similar factual scenario and some of the same parties. In *Pritzker,* the trustees of a pension plan brought claims in federal district court against MLPF&S, a MLPF&S broker, and Merrill Lynch Asset Management ("MLAM"),

---

1. A footnote in Optibase's brief contends that "[i]n addition, the facts support findings of estoppel and alter ego." However, "[a] contention is not sufficiently presented for appeal if it is conclusorily asserted only in a footnote." *Tolbert v. Queens College,* 242 F.3d 58, 75 (2d Cir.2001).

MLIM's predecessor in interest. The Merrill Lynch defendants moved to compel arbitration of the entire dispute on the basis of an arbitration clause that, by its terms, applied only to the trustees and MLPF&S. The Third Circuit concluded that the MLPF&S broker could compel arbitration on the ground that the broker acted as an agent of MLPF&S. Also, as Optibase emphasizes, the court permitted MLAM to compel arbitration by applying what the court called "[a]gency logic." *Id.* at 1122.

Optibase relies heavily on *Pritzker* to argue that (1) there is an agency relationship between MLPF&S and MLIM, and (2) MLIM is collaterally estopped from arguing in the present action that it is not bound by the arbitration agreement. These arguments fail for the reasons identified by the district court: in *Pritzker* "it was the non-signatory [MLAM] that sought arbitration ..., and the non-signatory appears to have participated directly in the account management that was at issue there." Supplemental App. at 112.

■ That first distinction, which Optibase contends is irrelevant, is decisive; it matters whether the party resisting arbitration is a signatory or not. *See Thomson–CSF*, 64 F.3d at 779. "[A] court should be wary of imposing a contractual obligation to arbitrate on a non-contracting party ...." *Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 97 (2d Cir.1999); *see Choctaw Generation Ltd. P'ship v. Am. Home Assur. Co.*, 271 F.3d 403, 406 (2d Cir.2001). Thus a willing non-signatory seeking to arbitrate with a signatory that is unwilling may do so under what has been called an "alternative estoppel theory," *Thomson–CSF*, 64 F.3d at 779, which takes into consideration "the relationships of persons, wrongs and issues," *Choctaw*, 271 F.3d at 406. But a willing signatory

(such as Optibase) seeking to arbitrate with a *non*-signatory that is unwilling (such as MLIM) must establish at least one of the five theories described in *Thomson–CSF*, 64 F.3d at 776–80.

True, *Pritzker* used "[a]gency logic" to permit MLAM to compel arbitration on the basis of an arbitration agreement covering only MLPF&S, 7 F.3d at 1122; however, that finding is muddled: first, it is far from clear that the Third Circuit equated "agency logic" with an actual finding of agency. Moreover, an important fact not present here appears to have motivated the decision in *Pritzker*—MLAM was the custodian of the trustees' account, and had certain obligations in connection with that account. *Id.* at 1113, 1122. In any event, it is MLIM's status as an unwilling non-signatory that ultimately distinguishes *Pritzker*.

Other circuits have implemented the distinction between willing signatories and non-signatories that are unwilling. *See Thomson–CSF*, 64 F.3d at 779 (citing *Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F.3d 753, 757–58 (11th Cir.1993); *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 320–21 (4th Cir.1988); *McBro Planning & Dev. Co. v. Triangle Elec. Constr. Co.*, 741 F.2d 342, 344 (7th Cir.1984)). The Third Circuit itself has recognized this distinction post-*Pritzker*. *See Bel–Ray Co. v. Chemrite (Pty) Ltd.*, 181 F.3d 435, 444–46 (3d Cir. 1999).

■ Arbitration is a matter of contract; so "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). MLIM did not agree to arbitration, and Optibase has failed to adduce facts that would support any of the five recognized theories on

which MLIM could be forced to arbitrate in the absence of an agreement. Accordingly, the district court did not abuse its discretion by concluding that MLIM demonstrated a likelihood of success on the merits.

### D. Laches

 Finally, Optibase contends that the equitable doctrine of laches defeats MLIM's motion for a preliminary injunction because MLIM did not seek an injunction until four months after Optibase filed its initial Statement of Claim. A party asserting a laches defense must show that "the plaintiff has inexcusably slept on [its] rights so as to make a decree against the defendant unfair." *Prudential Lines, Inc. v. Exxon Corp.*, 704 F.2d 59, 65 (2d Cir. 1983). Laches additionally requires a showing by the defendant "that it has been prejudiced by the plaintiff's unreasonable delay in bringing the action." *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 192 (2d Cir.1996).

The district court considered and rejected Optibase's laches defense:

> MLIM has presented evidence that, prior to bringing the instant action, it pursued its objections to the arbitration with the NYSE and with Optibase.... Under the circumstances, MLIM's delay was not so unreasonable that MLIM should be precluded from seeking relief from the arbitration.

Supplemental App. at 109.

We see no abuse of discretion. *See Conopco*, 95 F.3d at 193. Immediately after receiving the Statement of Claim, MLIM called Optibase to object to being named as a party. When MLIM was named in the Amended Statement of Claim, MLIM protested to the NYSE, and Optibase responded. When the NYSE ruled, pointedly, that the arbitration could proceed in 20 days absent a court order, MLIM acted within that 20–day period to file this action seeking an injunction. At no time did MLIM acquiesce or participate in the arbitration, or test the waters to gauge its chances of success in the arbitral proceeding.

There is simply no evidence that MLIM slept on its rights, or that Optibase suffered prejudice—let alone enough evidence of either to establish that the district court abused its discretion in rejecting Optibase's laches defense.

### CONCLUSION

The grant of a preliminary injunction is accordingly affirmed.